

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Dina Z. Gersten**, on behalf of herself and all others
similarly situated,

                                   Plaintiff,

- against -

**Deloitte & Touche LLP and Deloitte LLP (formerly**
**known as Deloitte & Touche USA LLP)**,

                                   Defendants.

Index No. _____

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff, Dina Z. Gersten, ("Plaintiff" or "Gersten"), by her attorneys, Folkenflik &

McGerity, for herself, and on behalf of all others similarly situated, for her claims against Defendants

Deloitte & Touche LLP and Deloitte LLP ("Defendants" or collectively, "Deloitte") alleges as

follows:

<u>**NATURE OF THE ACTION**</u>

1.      Plaintiff brings this lawsuit as a collective action under the Federal Fair Labor

Standards Act of 1938 ("FLSA"), 29 U.S.C. §201, et seq. and as a class action pursuant to Fed. R.

Civ. P. 23. The persons Plaintiff seeks to represent are: (a) current and former Non-Licensed

employees employed in the positions of Audit Assistant, Audit Senior Assistant, Audit In-Charge

and Audit Senior, (as defined by Deloitte), also sometimes referred to respectively as Staff 1, Staff 2,

Senior 1, and Senior 2, who have been employed by Deloitte to perform audits (collectively the

"Covered Positions") in the United States at any time since April 11, 2008 (the "Federal Eligibility

Period"), and to whom Deloitte failed to and continues to fail to pay overtime for work performed in

excess of forty (40) hours per week as required by Federal law (the "Federal Class"); and (b) current and former Non-Licensed employees who have been employed by Deloitte in the Covered Positions in the State of New York at any time since April 11, 2005 (the "New York Eligibility Period") to whom Deloitte failed to and continues to fail to pay overtime for work performed in excess of forty (40) hours per week as required by New York law (the "New York Class") (collectively the "Classes").

2.      Each of the classes the named Plaintiff seeks to represent are so numerous that the joinder of each member of the class is impracticable.

3.      There is a well-defined community of interest in the questions of law and fact affecting each of the classes and the unnamed plaintiffs which Plaintiff seeks to represent. The class members' claims against Deloitte involve common questions of fact and law. The claims of Plaintiff and the Classes are based on Deloitte's implementation and utilization of policies pursuant to which all members of the class were denied payment of overtime compensation during the time in question. The duties and tasks of Plaintiff and the Classes were governed by policies and practices which were established by law, professional standards and Deloitte's own centrally established internal policies and practices which governed the day-to-day conduct of the members of the classes and their superiors. The tasks performed by members of the Classes are subject to multiple levels of detailed review as to all material matters. The reviews are also conducted pursuant to policies, practices and requirements established by law, professional standards, and Deloitte's own policies and procedures applicable to all class members nationally. Proof of a state of facts common to the members of the class will entitle each member of the class to the relief requested in this Complaint.

4.      The named Plaintiff will fairly and adequately represent the interests of the Classes, because the named Plaintiff is a member of each of the Classes and the claims of the named Plaintiff are typical of those in each of the Classes.

5.      Deloitte violated New York State Labor Department's Codes, Rules and Regulations ("NYCRR") Ch. 12 §142-2.2 ("NYLL"), and Fair Labor Standards Act, 29 U.S.C. §207 et. Seq. ("FLSA"), each of which requires employers to pay employees, such as Plaintiff and the Class, overtime at the rate of one and one-half times the employee's regular salary for all hours worked in excess of 40 hours in any given workweek.

6.      By failing to pay their Non-Licensed Staff in New York any such overtime compensation, Deloitte violated the rights of their employees under Federal law and of the employees in New York under New York Law.  While each of the FLSA and NYLL contain narrowly defined exemptions for certain executive, administrative and professional employees, members of the Classes do not qualify for any of the statutory exemptions.

7.      As a result of Deloitte's violation of the New York and Federal labor laws, Plaintiff and the Classes were unlawfully under-compensated for their work, and are entitled to compensatory damages and statutory liquidated damages and penalties.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. §1331, the Federal statute in question being the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.,* and 28 U.S.C. §1367(a) as to the claims arising under state law.

9.      This Court also has subject matter jurisdiction over all claims pursuant to 28 U.S.C. §1331(d) the Class Action Fairness Act of 2005.  On information and belief, the district courts shall

have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. This action is a class action and on information and belief one or more members of the class of plaintiffs on whose behalf this action is brought, is a citizen of a state different from the Deloitte.

10.     The Southern District of New York is proper venue under 28 U.S.C.A. §1391(b)(1) because Deloitte's business headquarters is in the Southern District of New York, and a substantial part of the events that gave rise to the claims in this action took place in this judicial district.

## PARTIES

11.     Plaintiff is a resident of New York State currently living in New York City. She was hired by Deloitte in September 2005 and began her employment beginning January 2007 in the position of an Audit Assistant. She ceased working for Deloitte in August 2010. During that time, Plaintiff worked in each of the Covered Positions.

12.     Deloitte & Touche LLP is one of the largest privately held professional services businesses in the United States, and through its affiliates, is part of one of the largest such organizations in the world. The ultimate international parent of all of the affiliated Deloitte entities is Deloitte Touche Tohmatsu Limited ("DTTL"), a UK private company with limited liability referred to as "limited by guarantee."

13.     In the United States, Deloitte LLP is the member firm of DTTL. Like DTTL, Deloitte LLP does not provide services to clients. Instead, services are primarily provided by the subsidiaries of Deloitte LLP, including: Deloitte & Touche LLP; Deloitte Consulting LLP; Deloitte Financial Advisory Services LLP; Deloitte Tax LLP; Deloitte LLP helps coordinate the activities of these subsidiaries. Deloitte LLP and these subsidiaries are separate and distinct legal entities. Each of these

subsidiaries is organized under Delaware law, is separately capitalized, has its own Chairman and CEO and Board of Directors, and provides a distinct array of services. Deloitte & Touche LLP has its headquarters in the city and state of New York. Deloitte & Touche LLP offers audit services through its Audit and Enterprise Risk Services practice. ("AERS").

14.     Each of Deloitte & Touche LLP and Deloitte Touche L.L.P. is, and has been throughout the relevant time period, the employer of all members of the Classes for the purposes of the FLSA and NYLL.

## PLAINTIFF, CLASS AND REPRESENTATIVE ALLEGATIONS

15.     Defendant's primary source of business is the auditing of financial statements. What is generally referred to as an "audit" is the examination of client prepared financial statements made in accordance with Generally Accepted Auditing Standards ("GAAS"), or certain other recognized similar standards, and the expression of an opinion as to whether the client's financial statements are fairly stated and free of material misstatements. Non-partner employees at defendant Deloitte are divided into seven different categories: Audit Assistant, Audit Senior Assistant, Audit In-Charge, Audit Senior, Audit Manager, Audit Senior Manager and Audit Director. To be an Audit Manager or higher, an employee must be a Certified Public Accountant ("CPA"). The four lower positions do not require a CPA license. The proposed classes consist entirely of employees and former employees in the lower four positions, and excludes those who are licensed as CPAs.

16.     Every financial audit performed by Deloitte consists of five phases: 1) preliminary engagement activities, 2) audit planning, 3) performing the audit plan, 4) concluding and reporting, and 5) post-engagement activities. During their first two years at Deloitte, unlicensed employees

participate almost exclusively in phase three, performing the audit plan. Performing the audit plan means testing financial statements of clients to see if they are free of material errors.

17.     As unlicensed employees remain at the company for longer periods of time, they are promoted to positions as "seniors," where they continue to perform the same non-exempt tasks, and additionally act as "straw bosses," where they assign tasks to more junior employees and make sure the needed tasks are done.  Seniors may also be given the opportunity to participate to some degree in the planning and reporting phases of the audit.  In none of these tasks are the seniors performing any exempt duties.

18.     All proposed class members have received national core audit training commensurate with their respective levels of experience. The purpose of the national training is to ensure that all unlicensed employees perform audits in the same manner. The performance of audit procedures, which is also referred to as "auditing" or "testing" for members of the class primarily involves tasks such as adding numbers (or checking addition), multiplying numbers, comparing numbers to see if they are the same, and "observing inventory" which involves watching the client count inventory items and recounting on a sample basis.

19.     Other audit procedures include "testing internal controls," which involves tasks such as performing "walk throughs."  That task comprises asking the client to describe its procedures and recording what they say.   "Testing internal controls" also includes, on a sample basis, checking documents for proper signatures or other similar evidence that the "control" requirements (such as proper signatures on checks or shipping authorizations, two signatures on checks for amounts over a stated dollar value, or similar procedures) have been met.

20.     Staff also spend time in "rolling forward" last year's work papers, which comprises basically the mechanical task of deleting numbers and words which apply to last year's financial statements or testing, and inserting numbers and words which apply to the current year's financial statements and audit tests.

21.     Seniors spend significant time performing testing as well, but also supervise staff and participate to a limited degree in audit planning.   Generally, the "audit plan," and the work paper templates are copied largely, if not entirely, from the plan established in the prior year's audit of that client, referred to in the accounting business as "SALY," short for "Same As Last Year."  When the audit is of a new client or changes from a prior year, a licensed CPA, at least a manager, is deeply involved in establishing the plans.  In accordance with professional accounting standards, as a matter of law and of Deloitte internal policies, all audit plans must be approved by a CPA, and by the Partner with final responsibility for the audit (the "Audit Partner").   Seniors are also generally responsible for archiving the work papers on the "WAU" system.

22.     All audit work must be carefully documented in work papers, a task that takes much of the time of the Class members.   Seniors will often review the work papers prepared by more junior employees for accuracy and completeness.

23.     During the audit process, class members in their first two years of employment are required to discuss any significant issues as they arise with the seniors or managers on the engagement.  Seniors must discuss any significant issues with managers or Partners.  Class members are prohibited from making any final decision on any matter which might be material to the audit or to Deloitte's opinion on the financial statements without approval by the partner with final

responsibility for the audit.  Most of the time, approval must first be sought from one or more levels of more senior employees who then obtain approval from the Audit Partner.

24.     The audit approach developed by Deloitte seeks to standardize employee training across all offices of the firm. The software used by employees of Deloitte called Audit Systems 2 (AS/2), supports all phases of the audit process and contains tools for analyzing, documenting, managing, communicating and presenting information.  This software can generate Model Audit Programs ("MAPS"), which are like detailed roadmaps created during the audit planning phase which set forth how to complete each section of the audit.  Often in the audit process, statistical sampling is required.  When that occurs, Class members simply "plug in" certain parameters, such as the gross sales, gross profits, or other easily identified number into a computer program and it computes the sample size.  Another computer program will select which records or underlying documents should be reviewed in the sample.

25.     Deloitte has intentionally limited the potential for individual discretion and independent judgment of class members in order to maintain quality controls and to limit liability, as well as to comply with legal and professional requirements.

26.     State laws, including New York law, generally provide that unlicensed employees engaged in audits must work under the control and supervision of a CPA.  Similar rules have been promulgated by the American Institute of Certified Public Accountants ("AICPA"), a professional organization for CPAs, and the Public Company Accounting Oversight Board ("PCAOB"), a private non-profit corporation created by the Sarbanes-Oxley Act to oversee the auditors of public companies.

27. Companies whose financial statements are audited are generally referred to as *audit clients*, and the public accounting firms that perform audits are generally referred to as *audit firms, CPA firms, or independent auditors*. The professional practice of auditing financial statements in the United States is regulated and controlled by a mixture of private-sector and public standard setters and governing authorities.

28. Each individual state government issues CPA licenses for practice in that state and issues regulations that govern the work of accounting professionals within that state. There is a National Association of State Boards of Accountancy (NASBA) that is a voluntary association of state boards of accountancy (the common title of the state agency that regulates the practice of public accountancy in that state). NASBA has issued a Uniform Accountancy Act to be used as a model for accountancy laws in the various individual states.

29. All states have adopted the AICPA-administered Uniform CPA Exam. Each individual state, however, decides what else is required for an individual to be licensed and to work within its borders. State laws also identify those areas of service that are restricted to licensed individuals. All states restrict the service of auditing financial statements to licensed individuals.

30. State laws that affect and control CPAs go beyond licensing and include various rules that govern firms and individuals practicing public accountancy including ethics, quality control, and continuing professional education. These additional rules and regulations have a high degree of similarity and are generally patterned after comparable AICPA requirements. For example, ethics requirements generally are adaptations of the AICPA Code of Professional Conduct.

31. New York State has adopted detailed laws, rules, and regulations that govern the practice of public accountancy. The applicable Education Law is found primarily in Article 149,

*Public Accountancy.* Article 149 includes sections that define the profession of public accountancy, restrict the practice of public accountancy and use of the title CPA and similar titles, and establish the requirements for a license as a CPA. The Education Law is administered by the State Education Department (the "department"), the entity in New York that includes the State Board of Accountancy.

32.   The practice of the profession of public accountancy in New York State according to Article 149 includes *attest services*. Attest services require the independence of the licensee and include "any audit to be performed in accordance with generally accepted auditing standards [GAAS] or other similar standards developed by a federal government agency, commission, or board or a recognized international or national professional accountancy organization that are acceptable to the department in accordance with the Commissioner's regulations." (Section 7401-a). "Certified public accountant" or "CPA" means "any person who has received a license from the department or any other state as a certified public accountant for the practice of public accountancy." (Section 7401-a). Only a person licensed or otherwise authorized to practice under Article 149 shall practice public accountancy or use the title CPA or similar title. (Section 7402).

33.   To qualify for a license as a CPA, an applicant must fulfill a series of requirements including having received a bachelor's or higher degree in a program in accountancy recognized by the Commissioner's regulations, meeting an experience requirement, and passing a satisfactory written examination. (Section 7404). The written examination used in New York State is the one prepared and administered by the AICPA, i.e., the Uniform CPA Exam.   The Regulations of the Commissioner define the practice of public accountancy by reference to Education Law Section

7401-a and provide further details on educational requirements and licensing examinations. (Sections 70.1, 70.2, 70.3, and 70.4, respectively).

34.     The AICPA is a national, not-for-profit entity that exerts substantial influence on the practice of public accountancy in the United States. Before the creation of the PCAOB by the Sarbanes Oxley Act in 2002, the SEC had delegated responsibility for setting auditing standards (or GAAS) to the AICPA. The AICPA still sets standards that govern the audits of the financial statements of nonpublic companies in the United States. The AICPA prepares and administers the Uniform CPA Exam.

35.     The AICPA issues and enforces the Code of Professional Conduct (the "Code"). The Code sets ethical requirements for CPAs and states generally use of the Code as a point of reference in adopting their ethical requirements. Under the Code, virtually any matter of significance in connection with providing audit related accountancy service must be reviewed and approved by the CPA in charge of the engagement, who must *at all times* supervise the unlicensed associates who work on the engagement.

36.     The roles of the AICPA contributes substantially to the uniformity of auditing practice across the United States.

37.     The PCAOB is a not-for-profit entity in charge of standard setting and oversight of both the audits of public companies and the firms that perform those audits. To audit the financial statements of a public company whose securities are traded in the United States, the audit firm must be registered with the PCAOB. The registered firm's audit practice is routinely inspected by PCAOB inspectors to evaluate whether the firm is performing in accordance with professional standards. If the PCAOB becomes aware of departures from professional standards through inspections or other

means, the PCAOB can investigate and, if appropriate, discipline the firm and individual auditors. Under the structure created by SOX, the SEC oversees the professional standards set by the PCAOB. The PCAOB's standards apply to the audits of all public companies whose securities are traded in the United States.

38.     When the PCAOB became operational in April 2003, it adopted the existing auditing standards previously issued by the AICPA. The PCAOB has adopted several standards of its own since then.

39.     Together, the AICPA and PCAOB standards provide fairly specific requirements that apply to the audits of financial statements. These professional standards govern auditing practice throughout the United States.

40.     The SEC is a government agency that regulates publicly traded companies and exercises authority over the reports the companies file with it and over the stock exchanges. As previously explained, the SEC must authorize all PCAOB rules and standards before they become effective.

41.     On information and belief, most of the audit clients of Deloitte in the United States are publicly traded companies or subsidiaries of public corporations.

42.     The AICPA, PCAOB, and SEC all have rules that require the auditor of financial statements to be *independent* and that spell out in detail actions that impair independence of the audit firm, including prohibited activities by firm personnel. All the authorities state that performing management functions of a client impairs independence. Thus, no one working on an audit team can be involved in running the business of audit clients. This requirement of independence is uniformly required throughout the United States.

43.     Deloitte's internal standards provide strict limits on what activities can be performed by employees who are not CPAs.   An unlicensed Deloitte employee *cannot* (i)commit Deloitte to an audit engagement;   (ii) approve preliminary engagement activities, including the exercise of judgment to assess the potential risk of a potential audit engagement; (iii) approve and sign engagement letters; (iv) work without control and supervision of the licensed CPA;  iv) approve or depart from the audit plan/program; (vi) approve and sign any document containing a substantive opinion, conclusion or determination, including audit opinions, audit reports, internal control opinions on public companies (SOX 404 reviews), or certify financial statements; or (vii) advise client management on matters of significance.   Likewise, it is Deloitte's policy that Class members are not permitted to deviate from firm policies and procedures without approval.

**Facts Concerning the Representative Plaintiff.**

44.     Throughout that time period Gersten was employed by Deloitte, Gersten regularly worked in excess of 40 hours in a work week, often 55 hours or more in one week.  Gersten did not receive additional compensation for the overtime hours worked.

45.     Throughout her employment, Gersten performed her tasks under multiple layers of supervision.  The work performed by Gersten and the Class was not executive, administrative or professional as those terms are defined by Federal and New York labor laws.

46.     During all times relevant herein, the Class members supported the business of Deloitte by working under the direction of their superiors, the managers and partners of Deloitte. Such work involved the Class members assisting their superiors in the production of the products and services provided by Deloitte to its customers.

47.     The great majority of such work by Gersten and the Class members included, secretarial, clerical, and data entry support work, including filing papers, organizing and assembling documents, taking notes of meetings, entering data into spread sheets, schedules or forms, formatting spreadsheets, conforming data entered on journals, or subsidiary journals to original documents, adding numbers on journals, calculating percentages from numbers on financial statements or on journals, and similar tasks.  Such tasks require very little or no exercise of independent judgment or discretion, any advanced professional degree or license, or the prior completion of any extended course of academic or technical studies in accountancy.

48.     Many of the audit testing tasks performed by Class members were also performed by "interns" who had not completed their undergraduate degrees, but did receive overtime pay.

49.     Deloitte compensated the named Plaintiff and the Class members on a "salary only" basis whereby Gersten and the Class members were paid a fixed salary for all hours worked during each week and no overtime.

50.     Neither Plaintiff, nor the other members of the proposed Federal Class or the proposed New York Class, were or are part of any group exempt from the overtime requirements of Federal Law or the Labor Laws of the States and jurisdictions of the United States, including, without limitation, the Labor Laws of New York.

## FIRST CLAIM FOR RELIEF
### Restitution for Failure to Pay Overtime to the Federal Collective Group
### (Violation of FLSA §207)

51.     Plaintiff incorporates by reference all of the allegations of all prior paragraphs as

though fully set forth herein.

52.     Section 207(a)(1) of the FLSA provides, in pertinent part:

> Except as otherwise provided in this section, no employer
> shall employ any of his employees who in any workweek is engaged
> in commerce or in the production of goods for commerce, for a
> workweek longer than forty hours unless such employee receives
> compensation for his employment in excess of the hours above
> specified at a rate not less than one and one-half times the regular
> rate at which he is employed.
>
> 29 U.S.C. §207(a)(1) (2005).

53.     Section 213(a)(1) of the FLSA provides that the overtime pay requirement does not

apply to:

> any employee employed in a bona fide **executive, administrative, or**
> **professional capacity** (including any employee employed in the capacity
> of academic administrative personnel or teacher in elementary or
> secondary school), or in the capacity of outside salesman (as such terms
> are defined and delimited from time to time by regulations of the
> Secretary, subject to the provisions of subchapter II of chapter 5 of
> title 5 except that an employee of a retail or service establishment
> shall not be excluded from the definition of employee employed in a
> bona fide executive or administrative capacity because of the number
> of hours in his workweek which he devotes to activities not directly
> or closely related to the performance of his executive or
> administrative activities, if less than 40 per centuin of his hours
> worked in the work week are devoted to such activities).
>
> 29 U.S.C. §21 3(a)(l) (2005) (emphasis added).

54.     The Section 213(a)(1) exemption for employees employed in a professional capacity

is inapplicable because class members are not employed in a bona fide "professional" capacity. The

skills necessary to perform the tasks performed by Plaintiff and the other members of the Federal

15

Class are acquired through experience, apprenticeship, and limited training at Deloitte, as well as through self-study, but not as a result of undergraduate or graduate accountancy training.  To the extent that training in accounting terminology or double entry bookkeeping is useful for the performance of the jobs of members of the Classes, the necessary training and skills are those of an experienced bookkeeper.

55.    Audit manuals and detailed MAPS prepared and circulated by Deloitte set forth the duties and detailed instructions for the performance of the tasks required by persons working on audits.  These audit manuals, MAPS and uniform policies preclude the exercise of discretion and independent judgment by members of the Classes on any matter that is material to the financial statement being audited.

56.    Pursuant to statutory, professional and Deloitte's internal policies and practices, which are uniformly applied throughout the United States, *all* of the work of the members of the Federal Class must be reviewed in detail for accuracy by one or more licensed professionals.  No decision may be made by members of the Federal Class on any matter that is material to the financial statements being audited without the approval of the Partner with final responsibility for the audit.

57.    Because of these facts, among others, as a matter of law the members of the Federal Class are not exempt professionals.

58.    Because of the requirement of independence, the members of the Federal Class do not qualify for the administrative exemption based on the work done for audit clients.  The members of the Federal Class are engaged in producing a product, an audit, which Deloitte sells to its clients.  Because of these facts, among others, the members of the Federal Class do not qualify for the administrative exemption based on the work they do for Deloitte.

16

59.     There are no other exemptions applicable to Plaintiff and/or the other members of the Federal Class.

60.     Plaintiff and other members of the Federal Class, either regularly or from time to time, work more than forty (40) hours per week for Deloitte, and received no premium pay for hours worked in excess of forty (40) hours per week.

61.     In committing the wrongful acts alleged to be in violation of the FLSA, Deloitte acted willfully in that they knowingly, deliberately and intentionally, or in the alternative, recklessly failed to pay overtime to Plaintiff and the other members of the Federal Class in violation of the FLSA.

62.     As a result of Deloitte's failure to pay overtime, Plaintiff Gersten and the other members of the Federal Class were damaged in an amount to be proven at trial.

63.     Therefore, Plaintiff Gersten demands that she and the members of the Federal Class be paid overtime compensation as required by the FLSA for every hour of overtime worked in any work week for which they worked in excess of 40 hours and were not compensated, plus liquidated damages, interest and attorneys' fees as provided by law.

## SECOND CLAIM FOR RELIEF
### (Restitution for Failure to Pay Overtime to Members of the State Law Class)
### (Violation of NYCRR §142-22, NYLL §198)

64.     Plaintiff incorporates by reference all of the allegations of all prior paragraphs as though fully set forth herein.

65.     Plaintiff and other members of the New York Class are paid on a salary basis.

66.     New York law requires the payment of overtime compensation at one and one half times the regular rate for all hours worked in excess of forty (40) hours a week to non-exempt

employees, in the same manner, and to substantially the same extent as are provided in the FLSA. New York Labor Law §199, and 12 NYCRR §142-2.2 (2005).

67.     Accordingly, the overtime laws of New York, exempt from these overtime premium pay requirements certain "white collar" employees employed in a *bona fide* executive, administrative or professional capacity who are paid on a salary basis not less than a certain dollar amount.

68.     Neither Plaintiff, nor members of the New York Class, are part of any group exempt from the overtime requirements of the law of New York, for the same reasons as set forth above with respect to the FLSA.

69.     Plaintiff and all other members of the New York Class employed by Deloitte during the New York Class Period, either regularly or from time to time, worked and/or work more than forty (40) hours per week, entirely a salary basis with no overtime pay for hours worked in excess of forty (40) hours, and as a result thereof, suffered damages.

70.     Deloitte has and had no good faith basis for failing to pay members of the New York Class overtime as provided by law.

71.     Therefore, Plaintiff demands that they and all other members of the New York Class be paid overtime compensation as required by the overtime laws of New York, including, without limitation, NYLL §198 and NYCRR §142-2 (2005), for every hour of overtime worked in any workweek during the New York Class Period for which they were not so compensated, plus interest and attorneys' fees as provided by law.

72.     In addition, Plaintiff and all of the members of the New York Class also demand a reasonable sum not exceeding fifty dollars for expenses as well as reasonable attorney's fees and costs and any additional amount as liquidated damages equal to one hundred percent of the total

amount of the wages found to be due, pursuant to NYLL §198, as amended. Should a judgment not be paid in full within 90 days following issuance of such judgment, the amount of the judgment shall be increased by 15%.

WHEREFORE, Plaintiff, on behalf of herself and the other members of the Federal Class and the New York Class, demand judgment in their favor against Deloitte, individually, jointly and severally, for:

A.      Compensatory damages, including restitution for both regular and overtime compensation due Plaintiff and the other members of the Federal Class and the New York Class during the applicable Federal Eligibility Period and the New York Eligibility period, plus interest thereon at the statutory rate;

B.      An order temporarily, preliminarily and permanently enjoining and restraining Deloitte from engaging in similar unlawful conduct as set forth herein;

C.      Imposition of a constructive trust upon the assets of the Deloitte to the extent of the sums due to Plaintiff and the other members of the Federal Class and New York Class;

D.      The New York Class also demands a reasonable sum not exceeding fifty dollars for expenses as well as an additional amount as liquidated damages equal to one hundred per cent of the total amount of the wages found to be due pursuant to NYLL §198;

E.      The Federal Class also demands an additional amount as liquidated damages equal to one hundred per cent of the total amount of the wages found to be due pursuant to 29 U.S.C. §216(b);

F.      Interest;

F.  Reasonable attorneys' fees, litigation expenses and costs of suit;

G.  Because Deloitte's violation demonstrates a criminal indifference to its

civil liabilities, punitive damages under New York law; and

H.  Such other and further relief as the Court deems just and equitable.

DATED:  April 11, 2011

**FOLKENFLIK & MCGERITY**

By_____
Max Folkenflik (MF 2915)
1500 Broadway, 21st Floor
New York, New York  10036
Phone:  (212) 757-0400
*Attorneys for Plaintiff*

H. Tim Hoffman, Esq.
Hoffman & Lazear
180 Grand Avenue Suite #1550
Oakland CA 94612
Phone:  (510) 763-5700
*Attorneys for Plaintiff*